**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CHEVALA BROWN, | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| FLODRAULIC GROUP INCORPORATED, | JURY TRIAL DEMANDED |
| Defendant. | |

**COMPLAINT**

Plaintiff Chevala Brown ("Plaintiff") files this Complaint against Defendant Flodraulic Group Incorporated ("Defendant"). Plaintiff is a former employee of Defendant. Plaintiff alleges that Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.* ("Title VII") by (1) subjecting her to a hostile work environment based on her sex (2) subjecting her to quid pro quo sexual harassment, and (3) retaliating against her for engaging in a protected activity. Plaintiff shows the Court as follows:

**NATURE OF THE ACTION**

1.    Plaintiff asserts that Defendant violated Title VII by (1) subjecting her to a hostile work environment based on her sex which included repeated sexual

propositions from her immediate supervisor and regular sexual and vulgar statements from that same supervisor, (2) subjecting to her *quid pro quo* sexual harassment whereby the terms and conditions of her employment were made dependent on her acquiescence to her supervisor's sexual overtures, and (3) terminating her employment in retaliation for her protected activity of opposing sexual harassment, retaliation and gender discrimination. Plaintiff seeks (i) lost wages and benefits; (ii) compensatory damages; (iii) punitive damages; (iv) prejudgment interest; and (v) attorneys' fees and costs.

## JURISDICTION AND VENUE

2.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3.    Pursuant to 28 U.S.C. § 1391 and Local Rule 3.1(B)(3), venue is proper in this Court because the unlawful employment practices described herein were committed within the Atlanta Division of the Northern District of Georgia.

## PARTIES

4.    Plaintiff is a citizen of the United States of America and a resident of the State of Georgia; she submits herself to the jurisdiction of this Court.

5.    Defendant employed Plaintiff from approximately December 2018 to February 21, 2019 in Norcross, Georgia.

6.      Defendant is a for-profit corporation with its principal place of business at 3539 N. 700 W. Greenfield, Indiana, 46140.  Defendant maintains a physical location in the Northern District of Georgia and regularly does business in the Northern District of Georgia.

7.      Defendant may be served with process through its registered agent, Corporation Service Company, 40 Technology Pkwy South, #300, Norcross, GA 30092.

8.      Defendant is a covered employer under Title VII.

## ADMINISTRATIVE EXHAUSTION

9.      Plaintiff has satisfied all administrative prerequisites for bringing her Title VII claims in this Court.

10.     On April 9, 2019, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), in which she asserted her Title VII claims.

11.     On June 4, 2019, the EEOC issued a Notice of Right to Sue regarding Plaintiff's Charge of Discrimination.

12.     Plaintiff brings this suit within ninety days of her receipt of the Notice of Right to Sue.

3

**STATEMENT OF FACTS**

13.    Plaintiff is an African-American female.

14.    In approximately November or December 2018, Plaintiff interviewed with Defendant for the position of Warehouse/Shipping and Receiving.

15.    Plaintiff first interviewed with James Adams, Defendant's Warehouse Supervisor.  Mr. Adams is a white male.

16.    Plaintiff then interviewed Dean Friton, Defendant's General Manager.

17.    Following her interview with Mr. Friton, Plaintiff received a call from Mr. Adams.  Mr. Adams told her not to worry because she had the job despite the wishes of his direct supervisor Mr. Friton.

18.    Plaintiff started her employment with Defendant in December 2018. She reported directly to Mr. Adams.

19.    After Plaintiff's employment started, Mr. Adams told Plaintiff that Mr. Friton did not want to hire her because she was female and Mr. Friton thought a man should be hired in the position.  Mr. Adams also told Plaintiff that he told Mr. Friton the other applicants were no-shows to their interviews to guarantee that she would get the position.  Mr. Adams told Plaintiff that "[he] pulled a lot of strings to get [her] this job" and "[he] literally had to lie to get [her] this job."  Mr. Adams told Plaintiff, "your eyes got you this job."

4

20. On information and belief, Mr. Adams hired Plaintiff because he believed that Plaintiff would engage in a romantic relationship with him. Starting in December 2018, almost immediately after Plaintiff was hired, Mr. Adams began to pursue Plaintiff romantically.

21. Specifically, Mr. Adams repeatedly asked Plaintiff to go to lunch with him. When she agreed to go to lunch, he told her about his marriage problems, and told her that he was "not getting any."

22. Mr. Adams told Plaintiff that he previously had a sexual relationship with another employee who worked for Defendant. Mr. Adams told Plaintiff that he gave money and gifts to the other employee with whom he had sex.

23. Mr. Adams also repeatedly asked Plaintiff to go out for drinks with him after work. Plaintiff repeatedly declined those invitations.

24. Mr. Adams asked Plaintiff to go to other events and trips with him, including a New Year's event in Las Vegas, a Superbowl event, and to the symphony. Plaintiff turned down these invitations as politely as she could, mindful that Mr. Adams was her supervisor and, by his account, was single-handedly responsible for Defendant offering her the position over the discriminatory wishes of Mr. Friton.

25.    Mr. Adams subjected Plaintiff to frequent sexual propositions and sexual statements in the workplace.  These included:

a.  Telling Plaintiff that he was very attracted to her.

b.  Asking Plaintiff whether she "would date a white guy."

c.  Commenting that Plaintiff had a large backside.

d.  Regularly discussing sex, his own sexual desires and purported sexual history in the workplace, which included telling Plaintiff that, in his experience, "black girls got the most wet, then Hispanics, then Asians."

e.  Telling Plaintiff that his doctor told him that he had twice the libido that would be expected for a man of his age.

f.  Telling Plaintiff that he was going to get Mr. Friton a prostitute because he was "backed up" and so that he would not be such a "stick in the mud."

g.  Asking Plaintiff why woman had sex for free when they could get paid for it.

26.    On one occasion, Mr. Adams stood behind Plaintiff and made a "mmm hmm" noise. When Plaintiff inquired as to why he made that noise he said he was imagining Plaintiff in shorts.

27.    Mr. Adams's continued propositioning of Plaintiff and his graphic sexual comments were unwelcome, offended Plaintiff and made Plaintiff extremely uncomfortable.

28.    Mr. Adams's continued proposition of Plaintiff and his graphic sexual comments were objectively offensive.

29.    After Plaintiff turned down Mr. Adams's sexual advances again and again, he began to retaliate against her for not giving into him.  This retaliation took two forms.  First, Mr. Adams started to refuse to provide necessary training to Plaintiff regarding her position in an attempt to prevent her from performing her job successfully.  Second, Mr. Adams started to issue unwarranted discipline to Plaintiff. Both of these measures were intended to punish Plaintiff for spurning his advances.

30.    On February 15, 2019, Plaintiff made a complaint to Stacie Roeder in Human Resources about Mr. Adams's sexual harassment and retaliation against her for not giving in to his sexual advances.

31.    On February 19, 2019, Plaintiff met with Ms. Roeder and again complained about the sexual harassment, and also complained about Mr. Adams's retaliatory actions.  Plaintiff further complained in that meeting with Ms. Roeder that it was her understanding from Mr. Adams that Mr. Friton did not want to hire her because she is a woman.

32.     Ms. Roeder instructed Plaintiff to take off from work the remainder of February 19, 2019, and the next day, February 20, 2019.  She complied with this instruction.

33.     On February 20, 2019, Plaintiff received an email from Ms. Roeder stating that Human Resources had investigated Mr. Adams, Mr. Friton, and Morgana McBrowne, another female employee Mr. Adams was believed to be dating. The email from Ms. Roeder explained that Defendant had been "unable to verify [Plaintiff's] allegations," and that Defendant was closing the investigation and taking "no further steps."  The email further stated that Plaintiff would be reporting to Mr. Friton, the individual who originally did not want to hire her because she was female.

34.     That same day, Plaintiff responded to Ms. Roeder's email saying that she was uncomfortable with the situation and inquired as to who would be training her.  Plaintiff informed Ms. Roeder that she "[didn't] know what to do."

35.     Ms. Roeder did not directly respond to Plaintiff's questions or concerns and instead replied, "I cannot tell you what to do or not to do, but it is your decision whether you decide to come to work or not."

36.     No one informed Plaintiff that she would be disciplined, let alone terminated, if she did not report to work on February 21, 2019.

37.    Plaintiff did not report on February 21, 2019 because, as she had communicated to Ms. Roeder, she was uncomfortable reporting to Mr. Friton given his previous statements about her and her the very recent sexual harassment investigation.

38.    That day, February 21, 2019, Defendant terminated Plaintiff's employment and claimed that she resigned.

39.    Defendant terminated Plaintiff's employment because she engaged in the protected activity of complaining about Mr. Adams's sexual harassment and retaliation and complaining about Mr. Friton's gender discrimination.

40.    Due to Defendant's violations of federal law, Plaintiff has suffered lost wages and benefits, emotional distress, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

41.    On information and belief, Defendant continues to employ Mr. Adams.

## COUNT ONE
## Hostile Work Environment Based on Sex In Violation of Title VII

42.     Plaintiff reasserts and incorporates by reference all preceding paragraphs of the Complaint.

43.     Plaintiff's supervisor subjected her to severe and/or pervasive harassment based on her sex, which created a hostile work environment in violation of Title VII.

44.     Plaintiff's supervisor subjected her to frequent sexual propositions and regular sexual statements that were unwelcome and objectively and subjectively offensive.

45.     Defendant failed to take reasonable steps to prevent and correct the sexual harassment and hostile work environment that Plaintiff was forced to endure.

46.     As a consequence of the hostile work environment she endured, Plaintiff experienced emotional distress, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

47.     Defendant's actions and inactions in subjecting Plaintiff to a severe and pervasive hostile work environment were willful, wanton and in reckless disregard for Plaintiff's rights under Title VII.

48.     Defendant acted with malice or with reckless indifference to Plaintiff's Title VII rights.

49.    Plaintiff seeks compensatory damages, punitive damages, interest, reasonable attorneys' fees and costs.

## COUNT TWO
### Quid Pro Quo Sexual Harassment in Violation of Title VII

50.    Plaintiff reasserts and incorporates by reference all preceding paragraphs of the Complaint.

51.    Defendant subjected Plaintiff to "quid pro quo" sexual harassment wherein her employment, and the terms of conditions of her employment, were made contingent upon her agreeing to engage in a sexual relationship with her supervisor.

52.    Mr. Adams made it clear to Plaintiff that he was responsible for her receiving a job offer, that he had lied to get her the job, that Mr. Friton had wanted to hire a man, and that Plaintiff had received the job because of her physical appearance.

53.    Mr. Adams repeatedly propositioned Plaintiff, his immediate subordinate, to engage in a sexual relationship with him.  Among other things, he talked about her body, told her that he found her very attractive, asked whether she "would date a white guy," talked about his past sexual history with another employee of Defendant, and repeatedly asked Plaintiff to see him socially.

54.    Because Plaintiff continued to reject Mr. Adams's advances, he retaliated against her in ways that impacted the terms and conditions of her

employment.  Mr. Adams initially promised to train Plaintiff in her position, which was crucial to Plaintiff's ability to perform her job effectively.  After Plaintiff refused to give in to Mr. Adams's desire to have a sexual relationship with him, he then refused to provide her with that training, materially impacting her ability to be successful.  In addition, Mr. Adams also started issuing Plaintiff unwarranted performance discipline, putting her job in jeopardy.

55.    As a consequence of the quid pro quo sexual harassment she endured, Plaintiff experienced emotional distress, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

56.    Defendant's actions and inactions in subjecting Plaintiff to quid pro quo sexual harassment were willful, wanton and in reckless disregard for Plaintiff's rights under Title VII.

57.    Defendant acted with malice or with reckless indifference to Plaintiff's Title VII rights.

58.    Plaintiff seeks compensatory damages, punitive damages, interest, reasonable attorneys' fees and costs.

## COUNT THREE
### Retaliation in Violation of Title VII

59. Plaintiff reasserts and incorporates by reference all preceding paragraphs of the Complaint.

60. Plaintiff engaged in protected activity under Title VII by (a) communicating in writing to Ms. Roeder on February 15, 2019 about the sexual harassment and retaliation she was experiencing from Mr. Adams; (b) communicating orally to Ms. Roeder on February 19, 2019 about the sexual harassment and retaliation she was experiencing from Mr. Adams and the gender discrimination of Mr. Friton; and (c) communicating to Ms. Roeder on February 20, 2019 that she was uncomfortable reporting to Mr. Friton, the immediate supervisor of Mr. Adams and the individual who did not want to hire her because she was a woman.

61. Defendant retaliated against Plaintiff for engaging in protected activity covered by Title VII by terminating her employment.

62. As a consequence of Defendant's retaliation, Plaintiff experienced lost wages and benefits, emotional distress, humiliation, inconvenience, mental anguish and loss of enjoyment of life.

63. Defendant's actions in retaliating against Plaintiff were wanton and in reckless disregard for Plaintiff's rights under Title VII.

64.    Defendant acted with malice or with reckless indifference to Plaintiff's Title VII rights.

65.    Plaintiff seeks compensatory damages, punitive damages, interest, reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and the following relief:

a)    A declaratory judgment that the Defendant's practices complained of herein are unlawful under the Title VII;

b)    Full back pay and/or lost benefits;

c)    Front pay and benefits;

d)    Compensatory damages in an amount to be determined by the jury;

e)    Punitive damages in an amount to be determined by the jury;

f)    Attorney's fees and costs;

g)    An award of prejudgment and post-judgment interest; and

h)    All other equitable and other further relief as this Court deems just and proper.

Dated this 29th day of July 2019.

Respectfully submitted,

*/s/ Justin M. Scott*
Justin M. Scott
Georgia Bar No. 557463
SCOTT EMPLOYMENT LAW, P.C.
246 Sycamore Street
Suite 150
Decatur, Georgia 30030
Telephone: 678.780.4880
Facsimile: 478.575.2590
jscott@scottemploymentlaw.com